### REED v. MARKLAND.

No. 2514.

Court of Civil Appeals of Texas. Waco.

June 10, 1943.

Rehearing Denied July 15, 1943.

Frank B. Tirey and Willard McLaughlin, both of Waco, and Callaway & Callaway, of Brownwood, for appellant.

Conway & Scharff, of Waco, for appellee.

HALE, Justice.

This is a suit for damages on account of the breach of a sales agreement. On June 24, 1941, the United States Government entered into a contract with L. P. Reed for the construction of an airport to be located near Waco, Texas. In connection therewith, Reed desired to purchase certain asphalt paving materials prepared and mixed in accordance with the specifications contained in the construction contract, and to that end he entered into a written sales agreement with H. L. Markland on November 21, 1941. By the terms of the sales agreement, Markland undertook at his own expense to provide a standard hot asphalt plant of 1,500 pounds batch capacity to be located in Waco, to furnish and apply the tack coat on the surfaces to be paved at the airport, to prepare and mix approximately 27,000 tons of paving materials as called for in the contract therein referred to, and deliver the same at the worksite, deliveries to begin not later than December, 8, 1941, and to continue thereafter at an average of 300 tons per working day until completion, and in consideration thereof Reed agreed to pay $3.35 per ton for such materials.

In his original trial petition Markland pleaded verbatim the sales agreement declared upon and alleged that at the time the same was entered into he was the owner of an extensive asphalt mixing plant then located in Corsicana, approximately sixty miles distant from Waco; that he immediately dismantled his plant at Corsicana, moved it to Waco where it was re-assembled and set up in compliance with the sales agreement, constructed an adequate laboratory and completely equipped it, employed technical experts and laborers, purchased and had removed to his plant large quantities of asphalt, gravel, sand. and other materials necessary to the production and delivery required under the agreement, and on December 6, 1941, began the application of the tack coat on the surfaces to be paved; that on or about December 8, 1941, he had completed his plant, complied with his part of the agreement up to that date, and stood ready, able and willing to discharge all further obligations resting upon him thereunder; that in the alternative, if his plant was not completed before December 8, 1941, it was completed and he was ready to begin deliveries before Reed was ready to receive the same; and that, after complete compliance by him with his part of the agreement, Reed notified him by letter on December 11, 1941, he would not accept deliveries of the materials contracted for, thereby breaching the agreement, to plaintiff's damage in the sum of $25,000, for which amount he sued.

Reed answered with special demurrers and exceptions, a general denial and affirmatively pleaded that the sales agreement sued upon was corollary to his construction contract with the government; that under certain pleaded terms contained in the government contract, plaintiff's asphalt mixing plant was subject to the inspection and approval of United States Engineers; that on December 10, 1941, Lieutenant Kirk of the United States Engineers (hereinafter referred to as the engineer) inspected plaintiff's plant and found it was not up to the standard required in the government contract, but was defective in that (1) the plant was not of 1,500 pounds batch capacity, (2) there were no tell-tale

indicators on the aggregate scales, (3) the pug mill was not equipped with a spray bar, and (4) the engineer required plaintiff to furnish the factory rated capacity of his pug mill; that the engineer and defendant waived the right to then cancel the sales agreement with plaintiff on account of such defects but waited until December 19, 1941 when, by reason of the failure of plaintiff to comply with the requirements of the engineer, his plant was rejected; and that the failure of plaintiff to provide a plant in keeping with such requirements constituted a breach on his part of the sales agreement.

In his first supplemental petition, Markland denied his plant was subject to the inspection or approval of the United States Engineers under the terms of the sales agreement, but alleged, in the alternative, that if it was, then the first and only inspection made thereunder was on December 10, 1941, at which time the engineer found the plant met the requirements of the government contract except in two particulars, viz.: (1) There were no tell-tale indicators on the scales, and (2) there was no spray bar over the pug mill; that the engineer directed the installation of tell-tale indicators, which was immediately done, and the engineer waived the installation of the spray bar; that notwithstanding the approval of his plant by the engineer, Reed notified him, on December 11, 1941, of his intention not to receive delivery of the asphalt mix, thereby breaching the sales agreement; and that, if the engineer did reject his plant or make objections thereto as alleged by defendant, then such objections were fictitious, arbitrary and false and were made as the result of such gross mistake and failure to exercise an honest judgment as to amount to bad faith, and were so made at the instance of and in collusion with defendant. Each party thereafter filed additional trial pleadings which in their entirety cover 78 pages in the transcript.

The jury found on special issues that plaintiff provided a standard hot asphalt plant of 1,500 pounds batch capacity in Waco by December 8, 1941 and before the run-ways at the airport were ready to receive asphalt; when the engineer inspected plaintiff's plant on December 10, 1941, the same was in all material respects in compliance with the requirements of the United States Government, and at that time the engineer did not refuse to approve the plant, his only requirement being that plaintiff install tell-tale indicators, which requirement was thereafter met within a reasonable time and before the engineer rejected the plant; defendant had notified plaintiff at a time when defendant did not have his run-ways ready to receive asphalt and before the engineer rejected the plant that plaintiff would not be permitted to perform his part of the agreement; the engineer told plaintiff on December 10, 1941, it was not necessary to install a spray bar unless it was found to be necessary later during the operation of the plant and he thereafter failed to request plaintiff to install said spray bar before the rejection of the plant by him; the pug mill of plaintiff's plant had a capacity to mix 1,500 pounds of asphalt mixture in one batch, plaintiff knew such capacity and informed the engineer thereof; the act of the engineer in rejecting the plant after the tell-tale indicators were installed, his act in rejecting the plant without requesting plaintiff to install a spray bar, and his act in rejecting the plant on the ground that plaintiff did not know its capacity, was each an arbitrary act on his part, and defendant conspired with the engineer in each of such arbitrary acts; and that plaintiff would have produced and delivered the asphalt paving mixture as provided for in his sales agreement at a cost to him of $2.89 per ton if his plant had not been rejected. Upon the verdict of the jury, the court rendered judgment in favor of plaintiff for the sum of $12,420 and defendant has appealed.

Appellant contends under the 25 points upon which his appeal is predicated that the court erred (1) in overruling his special demurrers and exceptions to the pleadings of appellee, (2) in overruling his objections to the admissibility of certain testimony, (3) in refusing his request for a peremptory instruction, and (4) in submitting and refusing to submit certain issues to the jury. We have examined each point urged in the light of the holdings by the Supreme Court in the case of City of San Antonio v. McKenzie Construction Co., 136 Tex. 315, 150 S.W.2d 989, 996, where it is said: "When parties to a building contract agree to submit questions which may arise thereunder to the decision of the engineer, his decision is final and conclusive; unless in making it he is guilty of fraud, misconduct, or such gross mistake as would imply bad faith

or failure to exercise an honest judgment. Galveston, H. & S. A. R. Co. v. Henry & Dilley, 65 Tex. 685; 4 Tex.Jur., p. 709, sec. 4, and authorities there cited."

Appellant asserts the court erred in overruling his special demurrers to appellee's trial petition because (a) it affirmatively appeared therefrom that the agreement sued upon was "dependent upon and subject to the terms of a super contract" and (b) the cost and expense of furnishing the materials contracted for was not therein pleaded; and since appellee failed to allege that his plant was approved by United States Engineers, which was a necessary requirement under the government contract and hence under the agreement sued upon, and since he further failed to allege facts which, if true, would support the conclusion that he had suffered any damage, such petition was insufficient to state a cause of action.

While the sales agreement contained re-citations indicating it was made in contemplation of the pre-existing contractual obligations then resting upon appellant for the improvement of the Waco Airport, it made no direct reference to the United States Government and contained no provision to the effect that appellee's plant should be inspected or approved by United States Engineers. It did not affirmatively appear from the provisions of the pleaded sales agreement or from any allegation in appellee's petition that the plant to be provided by him was required to conform to all the specifications, if any, contained in the "super contract," or if so, as to what such specifications might have been. Having pleaded a valid executory sales agreement with appellant, complete compliance therewith by himself and his ability and willingness to continue in its performance up to the time of its breach by appellant, and the amount of his damages resulting from such breach, we think the allegations in the petition were sufficient to state a cause of action even though appellee did not therein plead his plant was approved by United States Engineers or the correct legal measure of his damages. Rules 45 and 47 of Texas Rules of Civil Procedure; Sikes v. Rulfs, Tex.Civ.App., 67 S.W.2d 405; Harkey v. Hindman, Tex.Civ.App., 19 S.W.2d 151; Border Rubber Co. v. Turney, Tex.Civ.App., 291 S.W. 959.

Appellant also says the court erred in overruling his special demurrer to appellee's first supplemental petition and in refusing to strike the same from the record because the matters therein alleged constituted a new and independent cause of action which should have been pleaded in an amended rather than in a supplemental petition. We do not agree with this contention. The only cause of action pleaded at any time was one for damages on account of the breach of the sales agreement. If the sales agreement was dependent upon and subject to the government contract, if under the terms of the government contract appellee's plant was subject to the approval of United States Engineers, and if the engineer rejected appellee's plant, all as affirmatively pleaded by appellant in his answer to appellee's trial petition, then such facts would constitute a good defense against the cause of action asserted unless it could be shown that the rejection was the result of arbitrary conduct and collusion on the part of the engineer and appellant. City of San Antonio v. McKenzie Construction Co., supra; McKenzie Const. Co. v. City of San Antonio, Tex. Civ.App., 50 S.W.2d 349; City of San Antonio v. McKenzie Const. Co., Tex.Civ. App., 88 S.W.2d 622; McKenzie Const. Co. v. City of San Antonio, 131 Tex. 474, 115 S.W.2d 617; City of San Antonio v. McKenzie Const. Co., Tex.Civ.App., 138 S.W.2d 568; McKenzie Construction Co. v. Chanowsky, Tex.Civ.App., 86 S.W.2d 480, error refused; Schoenfeld v. De Puy, Tex.Civ.App., 58 S.W.2d 574, error dismissed. Consequently, we think it was proper under the circumstances for appellee to plead the matters set up in his first supplemental petition as a response to the matters set up in appellant's answer, rather than to plead the same in an amended petition. Rules 69 and 80 of Texas Rules of Civil Procedure.

Appellant specially excepted to the allegations in appellee's pleadings with respect to (a) the removal of his plant from Corsicana to Waco and his preparations for the performance of his agreement, (b) his activities under the agreement in applying tack coat on the run-ways, (c) the fact that his plant was under steam at the time when the same was inspected by the engineer on December 10, 1941, and by reason thereof he could and if requested would have then demonstrated by actual operation it was capable of doing the work contracted for, and (d) facts showing the motive which prompted appellant to breach the agreement. Appellant also objected

to the testimony offered during the trial in support of such allegations. The grounds of each of the exceptions and objections thus presented were that such pleadings and proof was immaterial, irrelevant and prejudicial. Each of the exceptions and objections was overruled and the action of the court in overruling each is made the basis of a separate point in the brief. Without discussing the assignments separately, we deem it sufficient to say that in our opinion the pleadings and proof complained of tended to shed light upon the issues of fraud and bad faith and consequently the exceptions and objections were properly overruled. Thompson v. Texas Electric Ry. Co., Tex.Civ.App., 155 S.W.2d 624, error refused, points 1 and 2.

██ In his first supplemental petition appellee alleged that the reasonable cost of furnishing the 27,000 tons of material contracted for would have been $2.42 per ton and except for appellant's breach he would have received as net profit under the agreement the sum of 92¢ per ton, or a total of $25,000. Appellee specially excepted to such allegations on the ground that same were too vague, general and indefinite and did not apprise him of what items would make up the cost of the materials and in connection therewith he moved the court to require appellee "to itemize and specify all expense of the production of asphalt." Subject to the court's action on his exception, appellant affirmatively pleaded it would have cost appellee the sum of $3.47 per ton to comply with the agreement. The court overruled the exception and each party testified at length during the trial as to various items of expense tending to support their respective allegations concerning the legal measure of damages recoverable, if any. Ordinarily where lost profits is the measure of the damages for breach of a contract, it is proper for the complaining party to itemize the elements of cost and expense upon which such lost profits are based. However, we do not think any useful purpose would have been served in this case by requiring appellee to break down in his pleadings all possible items of expense entering into the performance of the agreement and the amount of each item. Apparently both parties were familiar in a general way with the cost of furnishing the materials contracted for before the agreement was entered into. Since appellant has failed to show that he was surprised, or prevented from presenting his evidence, or in anywise injured by the ruling complained of, the assignment must be overruled. Rule 434 of Texas Rules of Civil Procedure; Golden v. Odiorne, 112 Tex. 544, 249 S.W. 822; Cabaniss v. Grayburg Oil Co., Tex.Civ.App., 50 S.W.2d 437, error refused; King v. Lowry, Tex. Civ.App., 80 S.W.2d 790, error refused; Gay v. Crow, Tex.Civ.App., 111 S.W.2d 782, error refused.

We next consider the points under which appellant contends the court erred in refusing to peremptorily instruct the jury and in submitting certain issues over his timely objections. Upon the conclusion of the testimony he seasonably requested the court to instruct the jury to return their verdict in his favor on the ground that appellee had "failed to make out a case." He also objected to the submission of each of the issues requiring the jury to find whether the act of the engineer in rejecting appellee's plant was arbitrary and if so whether appellant conspired with the engineer in such arbitrary action, because such issues were not raised by the evidence and because they were insufficient separately and collectively to entitle appellee to any recovery. The action of the court in refusing his request for an instructed verdict and in overruling each of the foregoing objections is here presented as error.

██ It is elemental that the duty rests upon the trial court to submit in charge to the jury for its determination all ultimate controlling issues of fact raised by the pleadings and tendered by the evidence. Such issues may be tendered by direct evidence or by the proof of sufficient facts and circumstances to form the basis for a legal inference with respect thereto. The circumstantial evidence rule is especially applicable to cases involving fraud, collusion and bad faith. It is only when there is no evidence, direct or circumstantial, tendering issues essential to a recovery, or when the evidence relating to one or more of the controlling issues raised by the pleadings is undisputed and is such that reasonable minds may not differ in the conclusions to be drawn from the evidence with respect thereto, that the court is authorized to withdraw a case from the jurors or to direct their verdict. Moreover, in passing upon the sufficiency of the evidence to tender issues raised by the pleadings, it is the duty of an appellate court to view the evidence and all

reasonable inferences that may be drawn therefrom in the most favorable light from the standpoint of the prevailing party.

After hearing all the evidence in this case, the trial court was presumably of the opinion, as is manifest from the record and the manner in which he submitted the case to the jury, that the sales agreement was intended to be and was in fact dependent upon and subject to the terms of the government contract; and that under the pleaded terms of the government contract appellee's plant was required to be of 1,500 pounds batch capacity, equipped with telltale indicators and a spray bar over the pug mill, all subject to the approval of United States Engineers, as alleged by appellant. Consequently, we shall not attempt to set forth the substance of the provisions contained in the 69 pages of the printed government contract, but for the purpose of this appeal we assume without deciding that the construction thus placed by the trial court upon the two contracts in evidence was correct.

It appears without dispute that the telltale indicators and the spray bar referred to in the pleadings and evidence were each minor pieces of equipment which could have been easily and quickly installed. There was ample testimony tending to show that appellee's plant was capable of handling 1,500 pounds of asphaltic mix in one batch, that it had done so both before and after its inspection, that appellee knew such capacity and informed appellant and the engineer thereof at and prior to the time of its inspection. No question is raised as to the sufficiency of the evidence to support the findings of the jury that the engineer told appellee when the plant was inspected it was not then necessary to install the spray bar, his only requirement being that tell-tale indicators be installed, which was done. The finding that the plant was in all material respects in compliance with the requirements of the United States Government at the time when it was inspected by the engineer was based upon the submission of an issue specially requested by appellant. However, all reasonable presumptions must be indulged in favor of the action of the engineer and none against it. Although the evidence as a whole was amply sufficient to warrant the jury in concluding therefrom that appellant ought not to have terminated. the sales agreement and the engineer ought not to have rejected appellee's plant, these facts alone would not be sufficient to warrant an inference of fraud, misconduct or gross mistake. City of San Antonio v. McKenzie Construction Co., supra. Was there, then, any evidence showing bad faith and collusion on the part of appellant and the engineer and if so, was the same sufficient to show why, when and for what improper purpose the agreement was terminated and the plant rejected?

The evidence showed that the specifications in the government contract, as the same existed at the time when the sales agreement was entered into, required appellant to use washed, screened and processed sand and gravel in the making of the asphaltic mix which he agreed to purchase from appellee. Thereafter appellant secured from the engineers a change in the specifications which would enable him to use ordinary pit-run gravel. He leased a gravel pit in the neighborhood of the airport and began negotiations with one Cochran for the use of a mixing plant which was then located in Oklahoma. On or about December 7, 1941, appellant and the engineer went to Oklahoma where the engineer inspected and approved the Cochran plant for use on the Waco airport. After the sales agreement was terminated, appellant used Cochran's mixing plant and the pit-run gravel which he obtained from his lease and according to his testimony he thereby made an additional net profit on his government contract in excess of $20,000.

There was evidence that appellant and the engineer maintained their offices in a four-room house at the airport. The engineer considered and approved the sales agreement before it was entered into. At the time when he and appellant went together to Oklahoma for the purpose of inspecting the Cochran plant, they both knew that appellee's plant had been moved from Corsicana to Waco and that appellee was then engaged in applying tack coat on the run-ways at the airport but they had not inspected his plant. Before going to Oklahoma the engineer told appellee he was going to Dallas for the purpose of inspecting the Southwestern Laboratories whom appellee had employed as technical experts, but he did not tell appellee he was going to Oklahoma and he did not in fact call at the Southwestern Laboratories while in Dallas. Appellant and the engineer returned to Waco on December 9, 1941, at which time appellant informed appellee he

contemplated the use of another plant on the job and after some argument he stated, in substance, there were several ways to break the sales agreement.

On the afternoon of December 10, 1941, the engineer made his first trip to appellee's plant, inspected the same and left. Late in the afternoon he returned in company with appellant for additional investigation after which no further inspection was made. On December 11, 1941, he wrote, signed and handed to appellant in their offices at the airport the following letter: "As requested by you, I have this date, Dec. 10, 1941, inspected the asphalt plant designated by you to process and furnish asphaltic mixture for the paving of runways and taxiways of the Waco (New) Municipal Airport, Waco, Texas, and find that this plant does not meet specifications for the following reasons: No. 1. No tell-tale indicators on aggregate scales. No. 2. No tell-tale indicator on asphalt scales. No. 3. No spray-bar that will distribute the asphalt uniformly throughout the length of the mixer. No. 4. The capacity of the pugmill is unknown by the operator of the plant. In regard to item number four (4), I requested that this information be furnished." Appellee was not furnished with a copy of this letter until after December 19th, but on the same day, to-wit, December 11th, appellant wrote appellee advising that in view of the inspection made by the engineer and his report thereon, he (appellant) would not go forward with the sales agreement. Appellee acquiesced in the termination of the agreement and instituted this suit.

■ Viewing the record before us in its most favorable light from the standpoint of appellee, we cannot say there was no evidence that the engineer was guilty of misconduct or such gross mistake as would imply bad faith or the failure to exercise an honest judgment. While it is not practicable to here review or summarize all of the competent testimony bearing upon the issues of bad faith, we have carefully considered the same and in our opinion the facts and circumstances in evidence were clearly sufficient to sustain the findings of the jury with respect thereto.

■ At appellant's request, the court instructed the jury that by the word "arbitrary" as used in the issues submitted to them was meant "that the party to whose action the word refers, must have acted corruptly or wrongfully or through such gross mistake or error as would imply the exercise of a dishonest judgment"; that by the word "conspire" as used in the issues submitted to them was meant "that the party referred to knowing that another party is acting arbitrarily, as that term is defined, must have in some material manner brought about or promoted such arbitrary action"; and that, "in this connection, it is not enough that he knew the other party was acting from a wrongful or corrupt motive, but he must himself know or believe that such action is wrongful and not justified by the facts before he would be guilty of 'conspiracy' as used herein." In the light of the pleadings, the evidence and the foregoing instruction, we hold that the findings of the jury were sufficient as a matter of law to entitle appellee to a recovery. See cases cited in: Am.Jur., Vol. 9, Sec. 38, p. 28; C.J.S., vol. 17, Contracts, § 498, p. 1029; 110 A.L.R. p. 143.

■ And finally, appellant says the court should have submitted his timely requested issues inquiring of the jury (1) whether the engineer requested appellee, at the time of the inspection, to furnish him the factory rated capacity of his pug mill, (2) whether such information was ever furnished, and (3) whether the factory rated capacity of the mill was less than 1,500 pounds. The provisions of the government contract with respect to the required capacity of the pug mill are somewhat confusing. While reference is therein made to the factory rated capacity of the mill to be used on the work, it is also provided that "the measure of 'capacity of the plant' shall be its actual performance on the work to which these specifications apply." We do not deem it necessary, however, to pass upon whether the engineer did or did not have the right under the terms of the contract to request or require appellee to furnish him with the factory rated capacity of his pug mill. In the first place, there was no proof, or if so then there was no request for a finding, as to whether the engineer rejected the plant because of the failure, if any, of appellee to furnish its factory rated capacity. Furthermore, since appellant affirmatively pleaded that he and the engineer waived the right to cancel the sales agreement on December 10th because of such deficiency, if any, but waited until December 19th to reject the plant, and since the undisputed evidence shows that on December 11th appellant notified appellee he

**354**

would wait no longer for appellee to comply with the requirements of the engineer, we think it thereupon became immaterial what the factory rated capacity of the pug mill might have been or whether appellee did or did not thereafter furnish such information to the engineer. Tex.Jur., Vol. 10, sec. 261, p. 449, and authorities; Moore v. Jenkins, 109 Tex. 461, 211 S.W. 975; First Texas Prudential Ins. Co. v. Ryan, 125 Tex. 377, 82 S.W.2d 635. Having reasonably and fairly submitted to the jury all the ultimate controlling issues of fact raised by the pleadings and tendered by the evidence, no reversible error is shown by the refusal of the court to submit the additional issues requested by appellant. Rule 279 of Texas Rules of Civil Procedure.

Therefore, all of appellant's points and assignments are overruled, and the judgment of the trial court is affirmed.

TIREY, J., took no part in the consideration and disposition of this case.